**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 1, 2011**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

In re:

GARY E. KRAUSE,

      Debtor.

--------------------------------------

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

GARY E. KRAUSE; RICHARD L.
KRAUSE,

      Defendants,

and

LINDA S. PARKS,

      Intervenor - Appellee,

v.

DRAKE KRAUSE; RICK KRAUSE,

      Intervenors - Appellants.

No. 10-3012

**Appeal from the United States District Court
for the District of Kansas
(D.C. No. 6:08-CV-01132-WEB)**

John Val Wachtel, Klenda, Mitchell, Austerman & Zuercher, L.L.C., Wichita, Kansas, for Intervenors-Appellants.

Melissa Briggs, Attorney, Tax Division, Department of Justice, Washington, D.C. (John A. DiCicco, Acting Assistant Attorney General, and Bruce R. Ellisen, Attorney, Tax Division, Department of Justice, Washington, D.C., and Lanny D. Welch, United States Attorney, with her on the brief), for Plaintiff-Appellee United States of America.

F. James Robinson, Jr. and Gaye B. Tibbets, Hite, Fanning & Honeyman, LLP, Wichita, Kansas, on the brief for Intervenor-Appellee Linda S. Parks.

Before **KELLY,** Circuit Judge, **BRORBY,** Senior Circuit Judge, and **GORSUCH**, Circuit Judge.

**GORSUCH**, Circuit Judge.

Can a taxpayer avoid the IRS by moving money to a "diet cookie" company and then destroying records that might show the company to be a sham? Or by transferring assets to his "children's trusts" only to use the trusts to pay for his country club membership, buy cars, and fund his lifestyle? The answer, of course, is no. Why this is so takes a bit more explanation.

# I

Gary Krause's feud with the IRS traces back decades. Beginning in the 1970s, Mr. Krause developed public housing projects and promoted tax-shelter partnerships. It didn't take long, however, before the IRS challenged his attempts to deduct a variety of claimed losses. As happens in these things, litigation soon broke out and proceeded to consume the better part of a decade. At the end of it all, the two sides reached a settlement in which Mr. Krause agreed that he owed taxes for 1975, 1978, 1979, 1980, 1981, 1982, 1983, and 1986, and the IRS calculated his liability at $3.5 million.

But as it turned out the settlement settled nothing. In 2005, Mr. Krause declared bankruptcy under Chapter 7, claiming that he had no meaningful assets and seeking a discharge of his federal tax liabilities. The IRS responded by initiating an adversarial proceeding in bankruptcy court. The agency sought a declaration that Mr. Krause's tax debts were not dischargeable in bankruptcy, that Mr. Krause had fraudulently conveyed various of his assets to other entities, and that the IRS's pre-existing tax lien should attach to the assets held by those entities. Yet more litigation over these questions followed, but when the dust finally settled the bankruptcy court had decided two things.

First, the bankruptcy court held that two companies — Drake Enterprises and PHR, LLC — were the nominees or alter egos of Mr. Krause and that the IRS's tax lien attached to their assets. What these companies actually did and

whether they enjoyed any existence independent of Mr. Krause was never quite clear. Drake Enterprises claimed to market a so-called "diet cookie." PHR appeared to do no more than hold title to the family residence. What was clear, however, was this. During discovery Mr. Krause intentionally erased computer hard drives containing the records of both companies. And in the process he violated court orders compelling production of the materials. For this misconduct and after an exhaustive three-day evidentiary hearing, the court entered a sanctions order declaring that it would treat PHR and Drake Enterprises as the "nominees or the alter ego[s] of Krause and . . . thus [the] property of [Mr. Krauses's bankruptcy] estate and subject to turnover" to the IRS. Aplt's App. vol. 1, at 176.

Second, the bankruptcy court held that Mr. Krause had fraudulently conveyed certain assets to trusts nominally created for the benefit of his now-adult children, Drake and Rick Krause. Given this, the bankruptcy court held, the IRS tax lien attached to those assets as well. Unlike its holding with respect to Drake Enterprises and PHR, however, the bankruptcy court reached its conclusions about the trust assets on the merits and after a nine-day trial at which the court allowed Drake and Rick to intervene and participate along with their father.

After the bankruptcy court issued its final judgment, Drake and Rick, along with their father, appealed to the district court. The district court, however,

affirmed the bankruptcy court's judgment, and it is this decision that Drake and Rick, now proceeding without their father, ask us to reconsider and reverse.

II

Turning to second things first, we begin with the bankruptcy court's judgment that assets Mr. Krause transferred to the children's trusts are subject to the IRS's lien under 26 U.S.C. § 6321.  The scope of our review here is governed by that familiar formulation:  we assess legal questions *de novo* but will reverse the bankruptcy court's factual findings only if they are proven to be clearly erroneous.  *See In re Paul*, 534 F.3d 1303, 1310 (10th Cir. 2008) (noting that although matters like this one reach us only "after an affirmance by the district court, we directly review the bankruptcy court's" decision).  Because the facts found by the bankruptcy court in this case aren't meaningfully disputed, we proceed directly to our own analysis of the law's application to those facts.

On that score, § 6321 allows the IRS to satisfy a tax deficiency by attaching a lien on any "property" or "rights to property" belonging to the taxpayer.[1]  To determine whether a particular asset falls within the reach of a § 6321 lien, we and any court must engage in a two-part inquiry.  First, we must

---

[1]  "If any person liable to pay any tax neglects or refuses to pay the same after demand, the amount (including any interest, additional amount, addition to tax, or assessable penalty, together with any costs that may accrue in addition thereto) shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person."  26 U.S.C. § 6321.

ask what rights under state law, if any, the taxpayer has in the asset the IRS seeks

to attach. This step is necessary at the outset because it is, after all, "state law

[that] creates legal interests and rights" in things. *Drye v. United States*, 528 U.S.

49, 58 (1999) (internal quotation omitted). Second, now with a sense of what

state legal entitlement the taxpayer enjoys in the asset at issue — with a sense of

the bundle of rights state law gives him to the thing or *res* at issue — we must

ask, under federal law, whether those "state-delineated rights qualify as 'property'

or 'rights to property' within the compass of the federal tax lien legislation." *Id.*

As the Supreme Court has explained the relationship between these two steps, it is

"[s]tate law [that] creates legal interests and rights [and it is] [t]he federal

revenue acts [that] designate what interests or rights, so created, shall be taxed."

*Id.* (quoting *Morgan v. Commissioner*, 309 U.S. 78, 80 (1940)).[2]

A

In Kansas, as in most states, a debtor cannot evade his creditors by

fraudulently conveying his property to someone else. Such conveyances are, as a

matter of state law, "deemed utterly void and of no effect." *See* K.S.A. § 33-102.[3]

---

[2] The Court formulated the first portion of the test using slightly different language than we have, as requiring an inquiry into what rights the taxpayer has "in the property" under state law. *Drye*, 528 U.S. at 58. But, of course, the whole inquiry here is whether the taxpayer's interest *is* "property" or a "right to property" under federal law, and it is premature to assume the answer by treating the interest as *property* from the outset.

[3] "Every gift, grant or conveyance of lands, tenements, hereditaments,

(continued...)

Put differently, the transferor retains equitable ownership of the assets and those assets remain subject to attachment by his creditors. *See Gorham State Bank v. Sellens*, 772 P.2d 793, 796 (Kan. 1989) ("[A] debtor's property shall be liable for his debts, and he cannot avoid liability by a fraudulent transfer.") (internal quotation omitted). To determine whether a conveyance is fraudulent and so void as a matter of state law, Kansas law directs us to look for "six badges or indicia of fraud": "(1) a relationship between the grantor and grantee; (2) the grantee's knowledge of litigation against the grantor; (3) insolvency of the grantor; (4) a belief on the grantee's part that the contract was the grantor's last asset subject to a Kansas execution; (5) inadequacy of consideration; and (6) consummation of the transaction contrary to normal business procedures." *Koch Eng'g Co. v. Faulconer*, 716 P.2d 180, 184 (Kan. 1986) (internal quotation omitted).

Mr. Krause wears these badges boldly. In setting up the "children's trusts," he transferred money first to his wife who, in turn, transferred them to the trusts, all for no consideration. Mr. Krause also transferred various insurance policies to the trusts, again for no consideration. Each of these transfers took place after Mr. Krause knew the IRS was conducting an audit of his taxes and after the IRS

---

[3](...continued)
rents, goods or chattels, and every bond, judgment or execution, made or obtained with intent to hinder, delay or defraud creditors of their just and lawful debts or damages, or to defraud or to deceive the person or persons who shall purchase such lands, tenements, hereditaments, rents, goods or chattels, shall be deemed utterly void and of no effect." K.S.A. § 33-102.

issued a notice disallowing certain of his claimed losses. And while Mr. Krause's brother, Richard, served as trustee for the children's trusts, both he and Mrs. Krause have admitted that Mr. Krause controlled the assets in question at all times. Indeed, Mr. Krause maintained no personal bank account after 2000 but instead used the children's trusts to pay for his country-club memberships, car loans, and other personal expenses. And Mr. Krause did all this without objection from Richard, who candidly described his philosophy toward the trusts as "stick your head in the sand and then you don't know what is going on." Aplt's App. vol. 1, at 300. In light of these remarkable and undisputed facts, badges of fraud all, it is plain that Mr. Krause remained the owner of the transferred assets; that the children's trusts held those assets simply as his nominees; and that those assets are subject to attachment by Mr. Krause's creditors under Kansas law. *See also* William D. Elliott, *Federal Tax Collections, Liens and Levies* ¶ 9.10[1] (2d ed. 2000) ("The subject of nominee liens refers to situations when taxpayer's property or rights to property is held in the name of another or transferred to another party.").

When the facts are bad, they say, argue the law. And with the facts so badly against them, that's exactly what Rick and Drake do here. According to the brothers, our analysis and the bankruptcy court's necessarily rest on "reverse veil piercing." And this is legally problematic, they say, because Kansas courts

haven't yet adopted that doctrine. Neither, the brothers predict, are Kansas courts likely to do so if and when confronted with the question.

But as it happens we don't need to gaze into the crystal ball to divine what Kansas courts might do about reverse veil piercing doctrine. We don't because the doctrine has nothing to do with our decision. In a classic veil piercing scenario, of course, a court pierces the corporate form to hold an individual responsible for acts done in the name of the corporation because the court finds that the individual and corporation are one and the same, no more than alter egos. Analogously, in a reverse veil piercing case, a court permits a creditor to recover a debt from the assets of a corporation determined to be the alter ego of an individual debtor, the two being so intermixed as to be essentially indistinguishable. But none of this is necessary to our resolution of this case. To reach the result we do, we need and do hold only that Kansas law recognizes fraudulent conveyance doctrine; that Mr. Krause fraudulently conveyed certain particular assets (cash and insurance policies) to the children's trusts; that the trusts held those particular assets as Mr. Krause's nominees; and that, for purposes of Kansas law, those assets still belonged to Mr. Krause and so were lawfully subject to attachment to satisfy his debts.

The difference between finding an entity to be a nominee holding fraudulently conveyed assets and finding an entity to be the debtor's alter ego under reverse veil piercing doctrine may be a subtle one. But it is no less

significant for its subtlety.  Under reverse veil piercing doctrine, the IRS would have needed to show that the trusts at issue were not just Mr. Krause's nominees with respect to the particular assets in question but his alter ego for all purposes. *See Bollore S.A. v. Import Warehouse, Inc.*, 448 F.3d 317, 325 (5th Cir. 2006) (recognizing that "courts can reverse pierce a corporation's veil based on a finding of alter ego").  As reward for making this more onerous showing, the IRS might have seized all the assets in the trusts without regard to their original source.  *See Oxford Capital Corp. v. United States*, 211 F.3d 280, 284 (5th Cir. 2000) ("Under the alter ego doctrine, . . . *all* the assets of an alter ego corporation may be levied upon to satisfy the tax liabilities of a delinquent taxpayer-shareholder if the separate corporate identity is merely a sham.") (emphasis added).  By contrast, a nominee holding a fraudulently conveyed asset may maintain an independent legal identity and lawfully hold other assets of its own.  Finding that an entity is a nominee of the debtor only requires a showing that the nominee holds bare or apparent title to a particular asset that actually belongs to the debtor.  And it is only the particular assets held in this fashion (not others the nominee may possess in its own right) that the debtor's creditor may reach.  *See* Elliott, *Federal Tax Collection, Liens and Levies* ¶ 9.10[1]; Internal Revenue Manual § 5.17.2.5.7 (Dec. 14, 2007); Internal Revenue Manual § 5.17.2.5.7.2 (Dec. 14, 2007).

By way of example, suppose that someone besides Mr. Krause had legitimately donated money to the children's trusts.  Those funds would not have

been held by the trusts as nominees, and a nominee lien would not have attached to those assets. To obtain those funds, the IRS might have sought to attach liens on *all* trust assets. But to succeed in doing so under a reverse veil piercing theory, the IRS would have had to show that the trusts and Mr. Krause were effectively alter egos. That, of course, would have been a harder row to hoe, and it is one the government has not even attempted in this case. In this case, the IRS has sought only a nominee lien on particular assets Mr. Krause fraudulently conveyed to the trusts. And it is on that basis alone that we rest our decision, allowing the IRS to attach liens only to the assets Mr. Krause fraudulently conveyed to the trusts. Whether or not Kansas might allow or prohibit the IRS to do more than this through alter ego reverse veil piercing is beside the point.[4]

B

That leaves us to answer the second half of the § 6321 inquiry. Here we must ask whether Mr. Krause's rights to and interest in the particular assets he

---

[4] In some places in their briefing, Drake and Rick insist that the bankruptcy court didn't resolve the question of fraudulent transfer. *See* Aplt's Reply Br. at 1. This is also beside the point — and inaccurate. Beside the point because we have conducted our own, independent, *de novo* legal assessment of the IRS's lien claim, as we are required to do. And inaccurate because, in allowing the IRS's nominee lien, the bankruptcy court expressly found that Mr. Krause had fraudulently conveyed assets to the trusts. *See* Aplt's App. vol. 1, at 285-90. Later in its opinion, the brothers point out, the court said it didn't need to *repeat* the fraudulent conveyance analysis. *See id.* at 303 n.198. But that much surely must be true. No court must do the same thing twice.

fraudulently conveyed, as defined by Kansas law, qualify as "property" or "rights to property" under the federal tax lien statute.

The answer to that question is easy and affirmative. Section 6321's language "is broad and reveals on its face that Congress meant to reach every interest in property that a taxpayer might have." *Drye*, 528 U.S. at 56 (internal quotation omitted). Indeed, the Supreme Court has held that "[w]hen Congress so broadly uses the term 'property,' we recognize . . . that the Legislature aims to reach every species of right or interest protected by law and having an exchangeable value." *Id.* (internal quotation omitted). From this it follows ineluctably, we hold, that the terms "property" and "rights to property" for purposes of federal law under § 6321 embrace not only rights or interest with exchangeable value that the taxpayer holds formal legal title to, but also those that the taxpayer (as here) is found under state law to have fraudulently conveyed to a nominee.

The Supreme Court's decision in *Drye* illustrates the expanse of the terms "property" and "rights to property" under federal law and why they necessarily embrace Mr. Krause's interests. In *Drye*, the taxpayer was the sole heir to his mother's estate. Under state law, however, he was permitted to and did disclaim any interest in the estate, allowing the estate to pass to his daughter as the next lineal descendant. *See Drye*, 528 U.S. at 52. And once the estate was disclaimed, state law went a step further, prohibiting the taxpayer's creditors from touching

the estate.  Despite these notable features of state law restricting the interests enjoyed by the taxpayer and his creditors after a disclaimer, the Supreme Court did not hesitate in holding that the taxpayer had nonetheless received "property" or a "right to property" for purposes of federal law at the time of his mother's death. *See id.*  Whether or not denominated as "property" or a "right to property" for purposes of state law, the taxpayer's bundle of interests and rights guaranteed by state law — allowing him the choice either to keep the estate or channel it to another family member — were enough, the Court held, to render it "property" or a "right to property" for purposes of federal law.  Similar situations where § 6321 has been read to embrace interests and rights that may not be formally defined or thought of as "property" for purposes of state law abound.  *See, e.g., United States v. Craft*, 535 U.S. 274, 276 (2002) (holding that even though the state statute doesn't create a separate interest in entireties property, the federal tax lien statute still reaches such interest); *21 West Lancaster Corp. v. Main Line Rest., Inc.*, 790 F.2d 354, 357-58 (3d Cir. 1986) (ruling that while a liquor license didn't constitute "property" under state law, it was still "property" under the federal tax lien statute).  Of course, our case is far easier.  Even as a matter of Kansas law, Mr. Krause retained full equitable ownership over the fraudulently transferred assets, all of which possessed exchangeable value.  And that is easily and more than

enough to render his state law interests "property" or "rights to property" for purposes of federal law under § 6321.[5]

While reaching the right result, the bankruptcy court analyzed the federal law question slightly differently than we do. After resolving the status of the children's trusts under *state* law and at the behest of the parties, the bankruptcy court proceeded to analyze whether the trusts also qualified as Mr. Krause's nominees under *federal* tax law. In doing so, the court and parties apparently thought the federal law nominee question had to be answered by applying yet another set of factors nearly identical to the six badges of fraud used to determine a fraudulent conveyance under Kansas law. All this, however, was not only necessarily duplicative. It was also simply unnecessary. Once Mr. Krause's rights and interests were defined under state law, the remaining question under § 6321 wasn't whether the trusts were Mr. Krause's "nominees" for purposes of federal tax law but whether the rights and interests Mr. Krause enjoyed under state law were "property" or "rights to property" under § 6321. And given the expansiveness of those latter terms, there simply is no doubt of the answer: the liquid cash assets and various insurance policies Mr. Krause fraudulently conveyed

---

[5] While recognizing that interests having exchangeable value are undoubtedly "property" or "rights to property" under § 6321, the Court in *Drye* left open the possibility that non-transferable interests might nonetheless fall within the ambit of the federal tax lien statute. *See* 528 U.S. at 60 n.7. We, of course, have no need to answer that question here — the transferability of the assets at issue have been amply evidenced by Mr. Krause's own actions.

and so still equitably owned for purposes of Kansas law indubitably possessed

exchangeable value and thus qualified as "property" or "rights to property" for

purposes of federal law.[6]

## III

That still leaves us with the diet cookie company, the house holding

corporation, Mr. Krause's destruction of their corporate records, and the

bankruptcy court's sanctions order declaring both entities to be Mr. Krause's

nominees or alter egos.

To the extent the brothers seek to challenge the court's order with respect to

the cookie company, Drake Enterprises, we hold they lack standing. Long ago and

for many years, the Bankruptcy Code permitted only a "person aggrieved" by a

bankruptcy court order to challenge it on appeal. *Kane v. Johns-Manville Corp.*,

843 F.2d 636, 641-42 (2d Cir. 1988); *In re DBSD N. Am., Inc.*, ___ F.3d ___, 2011

WL 350480, at *4-5 (2d Cir. Feb. 7, 2011). To qualify as a "person aggrieved,"

---

[6] The parties seem to read our decision in *Holman v. United States*, 505 F.3d 1060 (10th Cir. 2007), as requiring their duplicative inquiry. We do not. *Holman* merely noted that "many courts use six factors" when deciding nominee or fraudulent conveyance issues, as indeed they do under state law. 505 F.3d at 1065 n.1. We cited for support *Spotts v. United States*, which did no more than point out that many state courts use these factors to assess a fraudulent conveyance or nominee claim under state law. *See* 429 F.3d 248, 253 & n.2 (6th Cir. 2005). We thus read *Holman* merely as noting the common use of these factors in assessing state fraudulent conveyance or nominee claims, and thus their relevance to the first step of the *Drye* inquiry — not as suggesting that the factors *must* be used to assess whether an asset qualifies as property or a right to property of the taxpayer for purposes of federal law under § 6321 at *Drye*'s second step.

courts held, the putative appellant had to show that his rights or interests were "directly and adversely affected pecuniarily" by a bankruptcy court's order. *Kane*, 843 F.2d at 642. While the Code has since been amended many times and the "person aggrieved" phrase no longer appears, *see* 28 U.S.C. § 158(d)(1); *id.* § 158(a)(1), many courts, including this one, have continued for decades to enforce the person aggrieved requirement as a matter of prudential standing. *See, e.g., Holmes v. Silver Wings Aviation, Inc.*, 881 F.2d 939, 940 (10th Cir. 1989); *In re El San Juan Hotel*, 809 F.2d 151, 154 (1st Cir. 1987); *In re PWS Holding Corp.*, 228 F.3d 224, 228 (3d Cir. 2000); *In re LTV Steel Co., Inc.*, 560 F.3d 449, 452 (6th Cir. 2009); *Matter of Andreuccetti*, 975 F.2d 413, 416 (7th Cir. 1992); *Matter of Fondiller*, 707 F.2d 441, 442-43 (9th Cir. 1983).

They have done so because, without such a requirement, bankruptcy litigation could easily "become mired in endless appeals brought by a myriad of parties who are indirectly affected by every bankruptcy court order." *Holmes*, 881 F.2d at 940 (internal quotation marks omitted). As the Second Circuit has explained:

> Bankruptcy proceedings regularly involve numerous parties, each of whom might find it personally expedient to assert the rights of another party even though that other party is present in the proceedings and is capable of representing himself. Third-party standing is of special concern in the bankruptcy context where, as here, one constituency before the court seeks to disturb a plan of reorganization based on the rights of third parties who apparently favor the plan. In this context, the courts have been understandably skeptical of the litigant's motives and have often denied standing as to any claim that asserts only third-party rights.

*Kane*, 843 F.2d at 644.

Our case proves the problem. Those affected by the bankruptcy court's order — Mr. Krause and his wife — do not seek to appeal the sanction order. Only the sons Drake and Rick are before us, and neither they nor the trusts of which they claim to be the beneficiaries have *any* interest in Drake Enterprises. In fact, even Drake and Rick's brief concedes that their father and mother were and are the sole shareholders of Drake Enterprises, just as the bankruptcy court found. Nor do Drake and Rick identify any other way in which they might be affected by an adverse decision against Drake Enterprises. Plainly, they lack prudential standing under our controlling precedent.

With respect to PHR, the story is slightly different. PHR is a limited liability company, and the trusts created for the benefit of Rick and Drake Krause are listed as members of that company. The government doesn't dispute that this is enough to afford them prudential standing to appeal the bankruptcy court's sanction order and, following the government's tack here, we will also assume without deciding that it is. Unlike certain other statutory or constitutional jurisdictional questions, the resolution of a sticky prudential standing question may be bypassed in favor of deciding the case on the merits when it's clear that the appellant will lose there anyway. *See Franchise Tax Bd. of Cal. v. Alcan Aluminium Ltd.*, 493 U.S. 331, 336-38 (1990) (assuming without deciding question of shareholder standing because appellants lose on the merits); *Kennedy v. Allera*,

612 F.3d 261, 270 n.3 (4th Cir. 2010) (assuming without deciding prudential standing).

And that's exactly the case we have before us. The only merits argument Drake and Rick level against the bankruptcy court's sanction order is one we have already addressed and rejected. The brothers simply and again accuse the bankruptcy court of having defied Kansas law by engaging in reverse veil piercing to find PHR and Mr. Krause alter egos. As it happens, however, the sanctions order declared PHR to be the "nominee[] *or* the alter ego of Krause and are thus property of the estate and subject to turnover." Aplt's App. vol. 1, at 176 (emphasis added). So even assuming Drake and Rick are correct in surmising that Kansas is likely to prohibit reverse veil piercing, the bankruptcy court's order remains independently and separately justified under nominee theory. And, as we have already explained and so won't repeat at length here, nominee theory is analytically distinct from reverse veil piercing theory. To defeat the bankruptcy court's sanction order, Drake and Rick must knock out each of the legs on which it rests. Even assuming they might succeed in knocking out one, they make no effort to displace the other. So it is that the bankruptcy's order necessarily remains standing, and the judgment in this case must be

*Affirmed.*