FILED
United States Court of Appeals
Tenth Circuit

June 25, 2019

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

MICHAEL DAVID WILHITE,

    Defendant - Appellant.

------------------------------

DARLA DEE WILHITE; YAHAB
FOUNDATION,

    Interested Parties - Appellants.

No. 17-1434
(D.C. No. 1:00-CR-00504-CMA-1)
(D. Colo.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **HOLMES**, **McKAY**, and **KELLY**, Circuit Judges.
_____

Michael Wilhite, Darla Wilhite, and the Yahab Foundation appeal the district

court's orders finding that Mr. Wilhite had an interest in Mrs. Wilhite's company,

Advanced Floor Concepts, LLC ("AFC"), granting the government's motion to sell

---

[*] This order and judgment is not binding precedent, except under the doctrines
of law of the case, res judicata, and collateral estoppel. It may be cited, however, for
its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

AFC, and granting the government's motion to garnish the funds in the Yahab Foundation's bank account.[1]

The United States filed a motion to dismiss for lack of appellate jurisdiction following Appellants' notice of appeal from the district court's orders finding that Mr. Wilhite had an interest in AFC and denying reconsideration of that finding. As the United States acknowledged at oral argument, however, the notices of appeal from the district court's subsequent orders have perfected the initial appeal. *See Lewis v. B.F. Goodrich Co.*, 850 F.2d 641, 645 (10th Cir. 1988) ("[W]hen a district court has adjudicated all remaining outstanding claims before this appellate court acts to dismiss the appeal, we will consider the appeal on its merits rather than dismiss for lack of jurisdiction . . . .").

The government's motion to dismiss the first appeal for lack of jurisdiction is therefore denied, and we will address the merits of all three appeals.

## I. FACTS[2]

In 2001, Mr. Wilhite pled guilty to wire fraud and aiding and abetting in violation of federal law. Mr. Wilhite was sentenced to three months' imprisonment followed by three years' supervised release. He was also ordered to pay restitution in the amount of $1,741,700.00 to the National Australia Bank and a $100.00 special

---

[1] AFC transferred $200,000 to the Yahab Foundation shortly after it was created by Mrs. Wilhite in 2014.

[2] To the extent that a full recitation of the procedural history of this case is aided by our consideration of district court documents not part of the record on appeal, we take judicial notice of those documents. *See Valley View Angus Ranch, Inc. v. Duke Energy Field Servs., Inc.*, 497 F.3d 1096, 1107 n.18 (10th Cir. 2007).

assessment fee. The judgment stated that Mr. Wilhite was to make restitution payments during his incarceration and supervised release, which Mr. Wilhite did. After his supervised release period ended, however, Mr. Wilhite did not make any voluntary payments on the debt.

In March 2015, the United States filed a writ of execution to recover on the $1,719,078.90 that remained of Mr. Wilhite's debt by "levying on and selling" AFC, Mr. Wilhite being identified as having a "[m]ajority membership interest" in that company. (Appellee's App. at 31–32.) Mrs. Wilhite filed a motion to quash the writ of execution on the basis that she alone owned AFC and Mr. Wilhite had no ownership interest in the company; her motion also requested an evidentiary hearing on this issue. Mr. Wilhite likewise requested a hearing on the basis that he had no ownership interest in AFC.

In June 2015, the government filed an amended writ of garnishment ordering the American National Bank ("ANB") to "withhold and retain any property in which [Mr. Wilhite] ha[d] a substantial nonexempt interest," "includ[ing] any accounts held in the name of Yahab Foundation, which is the nominee or alter ego of [Mr. Wilhite]." (*Id.* at 42 (emphasis omitted).) Mr. Wilhite requested a hearing on the basis that he had no ownership interest in the Yahab Foundation. The Yahab Foundation filed a motion to quash the writ similarly asserting that Mr. Wilhite did not have any interest in the Foundation; it likewise requested a hearing on this issue.

A magistrate judge heard evidence on the motions to quash over the course of several days and, in November 2015, issued a recommendation that the motions be

3

granted.  In his recommendation, the magistrate judge made the following findings: Mr. Wilhite had not held any assets in his name since 1992.  In June 1993, the Internal Revenue Service filed a lien against Mr. Wilhite for over $100,000 in unpaid taxes, approximately $70,000 of which had been assessed in 1984.  Mr. Wilhite knew about the tax lien by December 1996, if not earlier.

Mr. Wilhite worked with and for Geoff Clement between 1992 and March 1997, but he was not paid for his services until 1996, at which time he began receiving payments as an employee of Mr. Clement's company, Steel by Design.  In 1995, Mr. Clement and Mr. Wilhite learned how to construct steel-framed houses.  The following year, Mr. Wilhite asked a structural engineer, Mark Russell, to perform steel engineering work for Steel by Design.  Mr. Russell designed a new steel flooring system at that time, and he, Mr. Wilhite, and Mr. Clement then planned to start a new company based on the design.  The December 1996 Memorandum of Understanding for the new company specified that Mr. Russell and Mr. Clement would each own a 40% interest in the company for their respective roles of designer/engineer and financial backer and Mr. Wilhite would own a 20% interest for his role as manufacturer/installer.

In February 1997, however, Mr. Clement went to prison for defrauding investors, and Mr. Wilhite told Mr. Russell that the money intended for the new company was tainted.  The next month, Mr. Wilhite contacted the U.S. Attorney's Office to talk about his involvement with Mr. Clement.  The Federal Bureau of Investigation and the IRS interviewed Mr. Wilhite in June 1997 and told him that "he

4

was being looked into because the fraud involved over $5,000,000 and [his] name [wa]s all over the paperwork." (Appellants' App. at 46.)

Meanwhile, sometime around April 1997, Mr. Russell formed his own structural steel flooring company called Steel Dimensions, which used his design. That same month, Mr. Russell hired Mr. Wilhite to handle Steel Dimensions' sales. The following month, Mrs. Wilhite formed the company DW Support Services, LLC, to "have some type of company, i.e.[,] vendor status, to receive [Mr. Wilhite's] payments" for his work at Steel Dimensions.[3] (Id.) Mr. Wilhite accordingly asked Mr. Russell to characterize him as a "subcontractor" and to pay DW Support upon receiving invoices for his work at Steel Dimensions. Mr. Wilhite "received no interest in DW Support, no shares in AFC, nor any other consideration in exchange for the Steel Dimensions payments." (Id. at 47.)

Between April and October 1997, Mr. Russell trained Mr. Wilhite in structural steel floor engineering, including Mr. Russell's design, which was finalized and ready to use in September 1997. In October 1997, Mrs. Wilhite formed AFC, which used the steel floor system that Mr. Russell had designed. Mr. Wilhite testified that it would have been "ludicrous" for him to have formed a company in 1997 in part because of the IRS judgment "hanging over [his] head." (Id. at 47–48.)

---

[3] DW Support also had a "d/b/a" called Southern Colorado Construction Consulting, formed in August 1997. Through that company, Mrs. Wilhite performed progress inspections on construction projects for banks, the same work she had been doing at a different company since 1989.

In June 1998, Mr. Wilhite's attorney met with an Assistant U.S. Attorney to discuss the potential for immunity for Mr. Wilhite in the investigation concerning him and Mr. Clement. Mr. Wilhite testified that between 1997 and November 1999 he "had no idea" that he would have to pay restitution as a result of that case. (*Id.* at 48.) In March 1999, the National Australia Bank filed a civil lawsuit in federal court against Mr. and Mrs. Clement, Mr. Wilhite, and various companies the Clements owned, seeking $5,175,000 in damages for fraud, fraudulent transfer, and conversion. In November 1999, the United States filed criminal charges against Mr. Clement for his role in the National Australia Bank scheme. A year later, the government similarly charged Mr. Wilhite for his role. Mr. Wilhite agreed to plead guilty to wire fraud and aiding and abetting in December 2000. He received his sentence and restitution order for $1,741,700 in March 2001. In September 2001, at the parties' request, judgment was entered against Mr. Wilhite in the pending civil case for $1,741,100.

As for AFC, Mrs. Wilhite's 1999 Christmas letter relayed the successes of "her" company, DW Support, and "Michael's business," AFC. (*Id.* at 50.) The sales manager for a supply company that had contracts with AFC between 1993 and 2002 testified at the magistrate judge's hearing that Mrs. Wilhite had introduced herself as AFC's owner and seemed to work primarily "on the money side" of the business, having weekly contact with the sales manager, whereas Mr. Wilhite handled the "field operation or project manager" work on a daily basis. (*Id.*) AFC's manager of estimating/engineering since 2003 testified that he had been told Mrs. Wilhite owned

6

the company, but he interacted "a lot more" with Mr. Wilhite, only speaking with Mrs. Wilhite a few times a year. (*Id.* at 50.) Other AFC employees similarly testified that in their view Mr. Wilhite was "in charge" of the work, was AFC's "decision-maker," was "in charge of tax planning" for the company, and "operated the day-to-day company much more than Mrs. Wilhite." (*Id.* at 51–52.) There was one AFC employee, however, who stated that all major decisions "had to go through [Mrs. Wilhite]." (*Id.* at 51.)

Mr. Wilhite himself stated that he "ran" AFC's operations as its "general manager" and "CEO" between 1997 and 2008. (*Id.* at 52.) He presented evidence that he experienced some medical issues in the spring of 2008. On August 28, 2008, the Department of Justice sent a letter to AFC informing the company of the judgment against Mr. Wilhite and seeking information about his employment there. Mr. Wilhite completed and returned the form attached to the letter, checking the box indicating that he "[wa]s not employed by [the] firm" and noting, "retired 8-11-08." (*Id.* at 53.) Mr. Wilhite's last paycheck from AFC was dated August 15, 2008. Beginning on August 29, 2008, Mrs. Wilhite's bi-monthly AFC paychecks increased from the $2,290.00 she had previously been receiving to $4,176.20.

Although AFC's manager of estimating/engineering stated that the employees considered Mr. Wilhite to be on a "partial retirement," testimony by other AFC employees suggested that Mr. Wilhite did not truly retire in 2008 but remained "in charge" of the company. (*Id.* at 50, 53–54.) Indeed, in January 2011, Mr. Wilhite told his doctor that he traveled and stayed in hotels for his "businesses" over 200

7

nights per year. (*Id.* at 54.) Additionally, in August 2013, Mr. Wilhite signed as AFC's "CEO" a letter of intent for another company to purchase AFC. (*Id.* at 55.) The purchase fell through, however, because Mrs. Wilhite was "uncomfortable" with it. (*Id.* at 56.)

After making these findings, the magistrate judge nevertheless concluded that the United States had not established that Mr. Wilhite had either a legal or an equitable interest in AFC—and Yahab as a result—and accordingly recommended that the motions to quash be granted. The United States timely filed objections to the recommendation, and in September 2016 the district court issued an order rejecting the recommendation. Notably, the district court found the recommendation to "provide[] an extensive recitation of the facts of this case" and "incorporated [those findings] by reference" before providing a briefer factual recitation. (*Id.* at 78.) Turning to the merits of the case, the district court noted that the United States had not specifically objected to the magistrate judge's finding as to Mr. Wilhite's legal interest in AFC. The court then went on to conclude that the government had met its burden of demonstrating that Mr. Wilhite had an equitable interest in AFC—and therefore also in Yahab—under the factors set out in the Colorado Uniform Fraudulent Transfer Act ("CUFTA").

In March and April 2017, the district court held a two-day hearing on the issue of what percentage ownership interest in AFC's and Yahab's assets should be attributed to Mr. Wilhite. The government alleged that Mr. Wilhite had a 73.9% interest in AFC and a 72.4% interest in Yahab's assets based on the expert testimony

8

of a certified public accountant and certified fraud examiner. Appellants, however, contended that Mr. Wilhite had only a 10.45% interest in AFC and none in Yahab based on the expert testimony of an attorney experienced with limited liability companies. In an order issued in October 2017, the district court found the government's expert to be more credible and adopted his percentages. The court also concluded that these membership interests constituted "property" subject to levy by writ of execution pursuant to federal statutes. (*Id.* at 146.)

Appellants filed a motion for reconsideration arguing, among other things, that the government's claim against Mr. Wilhite based on fraudulent transfer was untimely under the statutes of limitations of CUFTA and the Federal Debt Collection Procedures Act. The district court denied the motion for reconsideration.

Meanwhile, the United States filed a motion for entry of a garnishee order directing ANB to give the government the funds in Yahab's bank account. The district court granted this motion, holding that the United States was entitled to the $14,150.16 that remained in Yahab's bank account from the $200,000 originally transferred there by AFC in 2014. The government also moved for entry of a decree of sale and to appoint a receiver for AFC. The district court likewise granted this motion, holding that the United States was entitled to foreclose on Mr. Wilhite's 73.9% interest in AFC and, pursuant to the test set forth in *United States v. Rodgers*, 461 U.S. 677 (1983), could force the sale of AFC and recoup the value of Mr. Wilhite's interest from the proceeds. The district court accordingly appointed a receiver to arrange for the sale of AFC. This appeal followed.

9

## II. ANALYSIS

Appellants first contend that the government's March 2015 writ of execution against AFC was barred by the statute of limitations set out in CUFTA. The statute specifically provides that "cause[s] of action with respect to a fraudulent transfer or obligation under this article [are] extinguished unless action is brought" within either one or four years, depending on which section of the statute forms the basis for the claim. Colo. Rev. Stat. § 38-8-110(1). As the United States points out, however, its March 2015 writ of execution was not filed under CUFTA but instead under federal statutes pertaining to the government's ability to collect restitution following the entry of judgment in a federal criminal case. Thus, the government did not file a "cause of action . . . under this article," and CUFTA's limitations periods do not apply.

Rather, the United States Code provides that a fine, including restitution, assessed in a federal criminal case "is a lien in favor of the United States on all property and rights to property of the person fined" that "continues for 20 years or until the liability is satisfied, remitted, set aside, or is terminated." 18 U.S.C. § 3613(c). A federal court's use of the CUFTA factors to determine whether something meets the definition of "property [or] rights to property of the person fined" does not thereby remove the property from the court's reach because a creditor filing under CUFTA would have needed to file sooner. *Cf. United States v. Mitchell*, 403 U.S. 190, 204–05 (1971) ("[E]xempt status under state law does not bind the federal collector. . . . [S]tate law which exempts a husband's interest in community

10

property from his premarital debts does not defeat collection of his federal income tax liability for premarital tax years from his interest in the community.").

Appellants next argue the district court incorrectly determined that Mr. Wilhite had an equitable interest in AFC through fraudulent transfer. We review the district court's legal conclusions de novo but review its factual findings only for clear error. *In re Krause*, 637 F.3d 1160, 1163 (10th Cir. 2011). Appellants do not truly dispute the factual findings made by the magistrate judge and adopted by the district court, as set forth above, but rather dispute the district court's conclusions as to their legal significance. Thus, our analysis will focus on the law's application to those facts. *See id.*

Federal law provides that "[t]he United States may enforce a [criminal] judgment imposing a fine in accordance with the practices and procedures for the enforcement of a civil judgment under Federal law." 18 U.S.C. § 3613(a). This provision is also applicable to "the enforcement of an order of restitution." § 3613(f). As noted above, such fines and restitution are "a lien in favor of the United States on all property and rights to property of the person fined," subject to the same treatment as a federal tax lien. § 3613(c). When the United States seeks to enforce its lien against identified property, we must consider a two-part test: "First, we must ask what rights under state law, if any, the taxpayer has in the asset . . . . Second, . . . we must ask, under federal law, whether those 'state-delineated rights qualify as "property" or "rights to property" within the compass of the federal tax

11

lien legislation.'"[4] *Krause*, 637 F.3d at 1163 (quoting *Drye v. United States*, 528 U.S. 49, 58 (1999)).

It is the first prong of this test that brought the magistrate judge and district court to CUFTA. Under that statute, a fraudulent transfer may be set aside so that a creditor can reach the asset to satisfy the debtor's debt. *See* Colo. Rev. Stat. § 38-8-108. CUFTA provides the following test for fraudulent transfer:

> A transfer made . . . by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made . . . , if the debtor made the transfer . . . (a) [w]ith actual intent to hinder, delay, or defraud any creditor . . . or (b) [w]ithout receiving a reasonably equivalent value in exchange for the transfer . . . and the debtor . . . [i]ntended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

*Id.* § 38-8-105(1).

Appellants do not dispute that a fraudulent transfer may occur at the moment an asset is created. *Cf. Holman v. United States*, 505 F.3d 1060, 1065 (10th Cir. 2007) ("'[P]roperty' and 'rights to property' may include 'not only property rights to property owned by the taxpayer but also property held by a third party if it is determined that the third party is holding the property as a nominee . . . .'" This may even apply to "[a] delinquent taxpayer who has never held legal title to a piece of property." (quoting *Spotts v. United States*, 429 F.3d 248, 251 (6th Cir. 2005))). Nor

---

[4] Appellants do not address the second prong of the test, and therefore neither do we. *See Bronson v. Swensen*, 500 F.3d 1099, 1104 (10th Cir. 2007) ("[T]he omission of an issue in an opening brief generally forfeits appellate consideration of that issue.").

do Appellants make any argument as to the government's ability to enforce its lien against AFC under federal law using the factors set out in CUFTA. We therefore proceed on the assumption of the parties that the government's lien on Mr. Wilhite's property can be enforced against AFC if the CUFTA factors support a finding of fraudulent transfer here.

CUFTA identifies eleven factors to which "consideration may be given, among others," to determine whether the debtor had the "actual intent" discussed in § 38-8-105(1)(a). Colo. Rev. Stat. § 38-8-105(2). The statute's delineated factors that are relevant to this case include whether: (a) the transfer was to an insider; (b) "[t]he debtor retained possession or control of the property transferred after the transfer"; (d) "[b]efore the transfer was made . . . , the debtor had been sued or threatened with suit"; (e) "[t]he transfer was of substantially all the debtor's assets"; (h) "[t]he value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred"; (i) "[t]he debtor was insolvent or became insolvent shortly after the transfer was made"; and (j) "[t]he transfer occurred shortly before or shortly after a substantial debt was incurred." *Id.* § 38-8-105(2).

We begin our analysis as the district court did, by noting that Colorado recognizes that fraud "from its nature . . . is difficult to prove . . . by direct evidence." *Powell v. Landis*, 36 P.2d 462, 464 (Colo. 1934) (internal quotation marks omitted). "Each case must depend on its own facts, and all the facts and circumstances connected with and surrounding the transaction are to be considered together in determining whether it was fraudulent." *Id.* (internal quotation marks omitted). We

13

additionally note that the factors identified in the statute are "a nonexclusive catalogue of factors appropriate for consideration." Colo. Rev. Stat. § 38-8-105 cmt. 5. In light of this, a summary of the totality of the circumstances surrounding AFC's creation may be helpful here.

The IRS filed a tax lien against Mr. Wilhite in 1993 for over $100,000 in unpaid taxes. Also during the 1990s, Mr. Wilhite worked with and for Mr. Clement at Steel by Design, where he met Mr. Russell. The three of them planned to form another business using Mr. Russell's new steel flooring design, but that plan fell through when Mr. Clement went to prison. Mr. Wilhite recognized that Mr. Clement's legal troubles could also implicate him and thus reached out to the USAO in the spring of 1997 and was interviewed by the FBI and IRS concerning the National Australia Bank fraud in June 1997. At that interview, Mr. Wilhite was told that he was "being looked into" based on the amount of money involved and the fact that his "name [wa]s all over the paperwork." (Appellants' App. at 46.)

Throughout that year, Mr. Wilhite worked for Mr. Russell and learned the steel flooring design from him. Then, in December 1997, Mrs. Wilhite formed AFC, a steel flooring company, despite the fact that she was not experienced in steel flooring; moreover, this company used Mr. Russell's design, which Mr. Wilhite, not Mrs. Wilhite, had been trained on. Mr. Wilhite himself testified that it would have been "ludicrous" for him to have formed a company in 1997 in part because of the IRS judgment "hanging over [his] head." (Appellants' App. at 47–48.) Meanwhile, the investigation continued, ultimately resulting in both a civil and a criminal

14

judgment against Mr. Wilhite.  Although he did receive paychecks from AFC for a number of years, Mr. Wilhite remarkably "retired" from the company seventeen days before the DOJ sent the company a letter regarding the outstanding restitution and inquiring about his employment there; indeed, Mr. Wilhite himself completed and returned the paperwork stating that he no longer worked at AFC.  Despite this, numerous AFC employees testified that Mr. Wilhite ran the company both before and after 2008.  Indeed, Mr. Wilhite signed a letter of intent regarding AFC's purchase as its "CEO" in 2013.

Turning to the enumerated factors, Appellants do not dispute that factor (a) was met here because, as Mr. Wilhite's wife, Mrs. Wilhite was an "insider."  They do, however, dispute the applicability of factors (e) and (i) (the debtor was insolvent and transferred nearly all his assets) on the basis that the $3,500 DW Support gave AFC at its inception was a loan and AFC had no value at that time.  We conclude that the $3,500 is not necessary to a finding that Mr. Wilhite, insolvent because of the tax lien "hanging over [his] head" (*id.* at 47–48), transferred nearly all his assets when he had his wife start AFC in her name so that he could run a company using the steel flooring design he had learned from Mr. Russell.  Furthermore, were we to accept Appellants' contention that AFC could not be fraudulently transferred at its creation because it did not then have value, we would establish a loophole for industrious debtors:  Have your spouse file the paperwork for a new business venture but otherwise run the company as your own, and the government will not be able to do

15

anything about it because no one could have said when the company was started whether it would have been successful or not.  We decline to do so.

Appellants additionally contest the applicability of factors (d) and (j), which ask whether the debtor had been "sued or threatened with suit" before the transfer occurred and whether "the transfer occurred shortly before or shortly after a substantial debt was incurred."  Colo. Rev. Stat. § 38-8-105(2)(d) and (j).  Appellants argue that neither the 1993 tax lien nor the 1997 National Australia Bank fraud investigation are sufficient to trigger factor (j).

Specifically, they assert that the tax lien was too old at the time AFC was created to be considered incurred "shortly before" AFC's formation, and, as both the magistrate judge and the district court concluded, Mr. Wilhite's knowledge of the investigation into the National Australia Bank scheme was not enough to put him on notice in 1997 that he was likely to incur a substantial restitution debt relating to that scheme.  For essentially the same reasons, Appellants also argue that Mr. Wilhite cannot be considered to have been sued or threatened with suit based on either the old tax lien or any potential future liability relating to the National Australia Bank.  Appellants further argue that the United States did not meet its burden of proof because the magistrate judge concluded that AFC's formation in Mrs. Wilhite's name alone could equally have been either because of Mr. Wilhite's poor credit rating or because of the tax lien; thus, the government failed to show that AFC was formed to help Mr. Wilhite avoid paying the "substantial debt" of his tax lien.

We are not persuaded by these arguments. We decline Appellants' invitation to haggle over the meaning of "shortly" in CUFTA factor (j). Certainly AFC was not created immediately after the IRS filed the tax lien against Mr. Wilhite, nor was it created immediately before the National Australia Bank and the United States brought suit against Mr. Wilhite. However, under the totality of the circumstances, particularly Mr. Wilhite's lengthy history of incurring and avoiding debts, we are persuaded that the government's evidence is sufficient for this factor to weigh in favor of a finding of fraudulent transfer. After all, "[f]raudulent transfer claims are equitable in nature," and "[e]quity looks to the substance of a transaction rather than its form." *Ciccarelli v. Guar. Bank*, 99 P.3d 85, 88 (Colo. App. 2004), *overruled on other grounds by Lewis v. Lewis*, 189 P.3d 1134, 1141 (Colo. 2008).

We are also persuaded that the government's evidence is sufficient to establish that Mr. Wilhite faced the threat of suit at the time of the transfer. AFC was formed some months after Mr. Wilhite had an interview with federal officers who warned him that they were looking into his involvement in a scheme involving his business partner. Moreover, as the district court explained, Mr. Wilhite faced the threat of an IRS action to collect on at least $31,000 in unpaid tax obligations that were still within the applicable statute of limitations. Finally, as for Appellants' argument that AFC's formation in Mrs. Wilhite's name might have been due to Mr. Wilhite's credit rating rather than his tax lien, Mr. Wilhite himself admitted that the tax lien was a reason not to form his own company in 1997. The fact that he also mentioned his poor credit does not undermine this admission.

17

Appellants go on to argue that Mr. Wilhite did not keep all assets out of his name, receiving paychecks from AFC and holding a truck as a joint owner with Mrs. Wilhite, plus filing joint tax returns with her. A debtor may commit fraudulent transfer of one asset, however, without fraudulently transferring everything else that could possibly be considered an asset held in his name; indeed, a debtor who truly holds nothing in his name is probably far more likely to attract the government's attention than one who maintains the appearance of having only moderate means while someone else holds the bulk of his assets.

The last factor Appellants contest is factor (b), which asks whether the debtor retained control of the property after the transfer. In essence, Appellants maintain that Mr. Wilhite's control of AFC was irrelevant to the question of fraudulent transfer because he claimed the title of CEO or president, and neither of those positions standing alone gives a person ownership of a company. Here again Appellants are asking us to establish a simple loophole for the fraudulent transfer of companies: Give the fraudulent transferor a title that solely involves running the company, and no court will be able to find fraudulent transfer because that title regularly imputes control without ownership. Once again, we decline to do so. The facts of this case demonstrate that Mr. Wilhite retained at least partial control over AFC's operations, regardless of what title he chose to adopt. We additionally note that Mrs. Wilhite's 1999 Christmas letter referred to AFC as "Michael's business." (Appellants' App. at 50.)

Ultimately, these factors that Appellants have chosen to nitpick are just that—factors, not elements. No factor standing alone is dispositive, nor is our analysis restricted to considering each in isolation. All the facts surrounding AFC's formation are sufficient to support the inference that Mr. Wilhite fraudulently transferred his interest in the company to his wife at its inception. We therefore affirm the district court's conclusion that Mr. Wilhite had an equitable interest in AFC.

Appellants next contend that the district court incorrectly calculated Mr. Wilhite's interest in AFC. Here, Appellants first argue that AFC's operating agreement only allowed new LLC members to be admitted on approval of existing members and that public policy "cautions against creating an ownership interest in a company based on work performed for that company." (Appellants' Br. at 41.) These arguments arise from a misunderstanding of fraudulent transfer. The district court did not "create" an interest for Mr. Wilhite in AFC. Rather, the district court identified the interest Mr. Wilhite had in AFC and gave it legal recognition so that Mr. Wilhite could no longer hide his ownership interest behind the documents filed in Mrs. Wilhite's name.

Appellants next complain about the considerations the district court found relevant and irrelevant based on the competing expert testimony it heard. Once again, we review the district court's factual findings for clear error. *Estate of Trentadue ex rel. Aguilar v. United States*, 397 F.3d 840, 859 (10th Cir. 2005). "'In applying the clearly erroneous standard . . . appellate courts must constantly have in mind that their function is not to decide factual issues de novo.'" *Id.* at 859–60

19

(quoting *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 123 (1969)) (alteration in original). Even if we were convinced that we would have decided the issue differently, the plain error standard would not entitle us to reverse the district court's findings. *Id.* at 859. Additionally, "[d]eference to the trial court's findings is at its greatest when those findings are based on determinations regarding witness credibility." *Id.* at 866.

Appellants' specific objections regarding the district court's calculation of Mr. Wilhite's interest in AFC are that the district court: (1) should have considered the personal guarantees Mrs. Wilhite made for AFC's benefit; (2) should have determined the value of Mr. Wilhite's service contributions to AFC by considering what AFC paid an actual employee to fill Mr. Wilhite's role after 2008 rather than by extrapolating from national data as the government's expert did; (3) should not have relied on the government's expert's calculation when it attributed full-time work to Mr. Wilhite after 2008; and (4) should have given Mrs. Wilhite a 5% interest in AFC for her formation of the company.

The district court identified several reasons that Mrs. Wilhite's personal guarantees on loans made to AFC did not entitle her to a contribution-based interest in the company as Appellants' expert testified. Relevant here, the district court found that "the guarantees were never called on and the risk never tempted," and Appellants' expert "[c]uriously" "did not attribute any contributions to Mr. Wilhite for his identical guarantees on these loans." (Appellants' App. at 142.) Appellants

20

assert that the district court was incorrect in its statement that Mrs. Wilhite never paid anything on the guarantees, citing to her testimony at the hearing.

Mrs. Wilhite's hearing testimony, however, was not that she ever had to pay anything on the personal guarantees she—and often Mr. Wilhite—made, but that she paid the loan extension fees with her own money and offered her own property—and in one case also Mr. Wilhite's—as collateral for the loan. Appellants' expert did not even testify that Mrs. Wilhite should be given credit for these items.[5] We conclude that the district court did not clearly error in declining to give Mrs. Wilhite credit for her personal loan guarantees.

Appellants' next two arguments pertain to Mr. Wilhite's work at AFC following his 2008 "retirement." The district court found that "substantial evidence in this case shows Mr. Wilhite's testimony under oath to the Court that he 'retired' in 2008 [wa]s blatantly false." (*Id.* at 139.) Appellants ignore this factual finding, however, and instead cite to the district court's statements of its uncertainty on this issue in an earlier ruling in which the court concluded that "supplemental briefing and a hearing [we]re necessary to address these issues." (*Id.* at 118.)

They claim that the district court could not properly rely on the government's expert attributing a full CEO salary to Mr. Wilhite after 2008 without additional

---

[5] Appellants have not made their expert's report a part of the record on appeal. Therefore, we have no way of knowing whether that report included the fees Mrs. Wilhite testified she paid with personal funds in the calculation of her financial contributions to AFC. *See* 10th Cir. R. 10.4(B) ("The court need not remedy any failure by counsel to designate an adequate record or to prepare an adequate appendix."). The expert's testimony at least did not.

21

evidence as to "the nature and quantity of the services provided by Mr. Wilhite after 2008." (Appellants' Br. at 48.) At the hearing, the government's expert testified that it did not matter whether Mr. Wilhite worked full- or part-time so long as he was filling the CEO role. The district court was entitled to find this testimony persuasive. As for the two experts' competing methods of valuing service contributions, it is not our place to second-guess the district court's conclusion that the government's expert was more credible on the issue.

Finally, Appellants maintain that the district court erred in rejecting their expert's testimony that Mrs. Wilhite should be given a 5% interest in AFC based on her work in forming the company. Their only argument is that this recommendation was based on a New York state court case. The district court expressly rejected the suggestion on the basis that it was "contradicted by an abundance of evidence in the record" showing that Mrs. Wilhite was not in truth AFC's "founding and sole manager." (Appellants' App. at 141 n.5.) We see no clear error. The district court's determination that Mr. Wilhite had a 73.9% interest in AFC is affirmed.

Appellants next argue that any interest Mr. Wilhite had in AFC did not give him an interest in the Yahab Foundation or its assets. We previously stated that AFC transferred $200,000 to the Yahab Foundation shortly after the Foundation was created by Mrs. Wilhite. *See supra* n.1. In its order rejecting the magistrate judge's recommendation, the district court gave a more detailed history of the Foundation's formation and that initial transfer: "[T]he Government began investigating Mr. Wilhite's assets, and in September 2014, served both Mr. and Mrs. Wilhite with

22

notices of deposition. Just days before being deposed, Mrs. Wilhite created the Yahab Foundation (Yahab). On December 31, 2014, AFC transferred approximately $200,000 to Yahab." (Appellants' App. at 87.) Appellants do not question the accuracy of these findings, and therefore our analysis will once again focus on their legal significance, which we review de novo. *See Krause*, 637 F.3d at 1163.

In its ruling on Appellants' motion for reconsideration, the district court noted that it "agree[d] with the Government that the $200,000 transfer was, in substance, a distribution of AFC's profits," in which Mr. Wilhite had an interest because of his membership interest in AFC. (Appellants' App. at 195.) *See* Colo. Rev. Stat. § 7-80-503 ("The profits and losses of a limited liability company shall be allocated among the members . . . ."); Colo. Rev. Stat. § 7-80-504 ("Distributions of cash or other assets of a limited liability company shall be allocated among the members . . . ."). The district court also cited to *Rocky Mountain Gold Mines v. Gold, Silver & Tungsten*, 93 P.2d 973, 982 (Colo. 1939), in which the Colorado Supreme Court stated, "Equity . . . has to do with the substance and reality of a transaction—not the form and appearance which it may be made to assume" (internal quotation marks omitted).

Appellants' argument is quite simple: They maintain that AFC's transfer of funds to the Foundation was a transfer of LLC assets—to which no LLC member has any claim—instead of a distribution subject to sharing among LLC members. We need not concern ourselves here with the legal status of transfers made from LLCs to charitable organizations under ordinary circumstances. The circumstances

23

surrounding AFC's transfer to the Yahab Foundation were anything but ordinary: Days before being deposed regarding her husband's outstanding $1.7 million restitution debt, Mrs. Wilhite decided to form a charity she subsequently funded with $200,000 from a company in which Mr. Wilhite had a fraudulently transferred 73.9% interest. Under these facts, we have no trouble concluding that the transfer of funds from AFC to the Foundation was a distribution of AFC's assets, which was to be allocated among AFC's members—including Mr. Wilhite—in accordance with Colo. Rev. Stat. § 7-80-504. We therefore affirm the district court's conclusion that Mr. Wilhite's interest in AFC also gave him an interest in the $200,000 AFC transferred to the Yahab Foundation.

Appellants further contend that the district court erred in ruling that the United States could garnish all the funds in the Yahab Foundation's bank account upon its determination that Mr. Wilhite had a 72.4% interest in the Foundation. Appellants, however, misunderstand the nature of the district court's ruling. The court did not conclude that Mr. Wilhite had a 72.4% interest in the Yahab Foundation but rather concluded that his 2014 ownership interest in AFC—72.4%—entitled him to that percentage of the $200,000 of AFC's assets that were transferred to the Foundation's bank account. Accordingly, $144,800 of the $200,000 belonged to Mr. Wilhite and could be garnished by the government to satisfy its lien against all of Mr. Wilhite's property. There is no evidence that any other funds were ever transferred to Yahab, nor is there any suggestion in the record that Yahab's account balance ever went lower than the $14,150.16 that the district court ultimately ordered garnished. Under

24

these circumstances, Appellants have not shown that the district court abused its discretion in concluding that the government was entitled to retrieve the entire $14,150.16 that remained in the account. *See United States v. Henshaw*, 388 F.3d 738, 739–40 (10th Cir. 2004) ("[T]he resolution of this case turns on the selection of an appropriate equitable method for tracing money that has lost its separate identity. . . . [O]ur review is limited to an abuse-of-discretion standard."); *Foster v. Hill*, 275 F.3d 924, 927–28 (10th Cir. 2001) (noting that Colorado law permits courts to impose a constructive trust over fraudulently or mistakenly acquired property that is commingled with other funds in a bank account; courts may then apply the "lowest intermediate balance rule" to trace the trust funds, under which "the constructive trust beneficiary may retrieve the lowest balance recorded after the funds were commingled."); *cf. People v. Shidler*, 901 P.2d 477, 479 (Colo. 1995) ("Commingling [of an attorney's personal and client funds] is dangerous to the client and a serious disciplinary offense because it can subject client funds to the claims of the lawyer's creditors."). We affirm the district court's conclusion.

Lastly, Appellants argue that the district court erred in ordering the sale of AFC to satisfy Mr. Wilhite's restitution lien. The United States sought to foreclose on Mr. Wilhite's 73.9% interest in AFC through a forced sale of AFC pursuant to 26 U.S.C. § 7403. Section 7403(c) states that the court, "in all cases where a claim or interest of the United States . . . is established [in specific property], may decree a sale of such property . . . , and a distribution of the proceeds of such sale."

Appellants recognize that *United States v. Rodgers*, 461 U.S. 677, 709–11 (1983), provides the relevant test for when a court may order the sale of property in which the debtor has only a partial interest. *Rodgers* identifies four nonexclusive factors to be assessed:

> First, a court should consider the extent to which the Government's financial interests would be prejudiced if it were relegated to a forced sale of the partial interest . . . . Second, a court should consider whether the third party with a non-liable separate interest in the property would, in the normal course of events . . . , have a legally recognized expectation that that separate property would not be subject to forced sale . . . . Third, a court should consider the likely prejudice to the third party . . . . Fourth, a court should consider the relative character and value of the non-liable and liable interests held in the property . . . .

*Id.* at 710–11. We conclude that these factors, considered as a whole and not as a "mechanical checklist," *id.* at 711, support the district court's conclusion that AFC should be sold in its entirety despite Mrs. Wilhite's 26.1% interest. We are doubtful that potential buyers would be thrilled with the idea of purchasing a 73.9% interest in a company to be shared with the former owner's wife. Also, Mrs. Wilhite's hands are not clean here, and we are disinclined to be concerned about her indignation at having to sell the company she started to help her husband avoid his creditors. As for AFC's employees, assuming their interests are even relevant, we see no reason to conclude, as Appellants have, that they will not retain their jobs once AFC passes to new ownership.

Finally, Appellants contend that the United States did not comply with § 7403(b) because Kubota Credit Corporation, U.S.A., and possibly ANB had a lien

26

on and a security interest in, respectively, "AFC assets." (Appellants' Br. at 59.) Section 7403(b) provides, "All persons having liens upon or claiming any interest in the property . . . shall be made parties" to the foreclosure action. Appellants consistently identify Kubota's lien as being on AFC's assets, not on AFC itself. The district court did not order a liquidation of AFC's assets, but rather the sale of AFC as a going concern. Appellants have not demonstrated how a change in AFC's ownership would affect any liens on AFC's assets, which are owned by AFC and not by AFC's owners. Therefore, we see no error and affirm the district court's order calling for the sale of AFC.

### III. CONCLUSION

For all the foregoing reasons, the district court's rulings are **AFFIRMED**. The government's motion to dismiss the appeal for lack of jurisdiction is **DENIED**.

Entered for the Court


Monroe G. McKay
Circuit Judge

27